Sweeney v. Williams.

JEREMIAH C. SWEENEY

v.

WASHINGTON B. WILLIAMS, receiver of Mechanics and Laborers Savings Bank of Jersey City.

The president of a savings bank abstracted a large amount of its securities. He afterwards fraudulently conveyed a farm to one of the active managers of the bank, who was cognizant of the whole transaction, receiving from him a bond and mortgage as part of the pretended purchase-money. The president, then, in order to make an apparent partial restitution, and to secure the bank for his malfeasance, assigned the bond and mortgage to the bank, with the knowledge of the manager, who paid to the bank the interest thereon as it fell due with money given to him by the president. The bank subsequently was placed in a receiver's hands.—*Held*, that this court will not enjoin the receiver's proceeding at law to obtain judgment against the manager on the bond, on the ground that the bond is without consideration.

On final hearing on bill, answer and proofs taken in open court.

*Mr. Gilbert Collins,* for complainant.

*Mr. Washington B. Williams, pro se.*

VAN FLEET, V. C.

The defendant is the receiver, appointed by this court, of the Mechanics and Laborers Savings Bank of Jersey City, an insolvent corporation. Among the assets which came to the defendant's hands, were a bond and mortgage made by the complainant to one John Halliard for $10,000, bearing date November 1st, 1876, and which Halliard had assigned to the bank by an assignment bearing date April 19th, 1877. The defendant has brought an action at law against the complainant on the bond, and the object of this suit is to have that action perpetually enjoined. The complainant puts his right to the relief he asks on a single ground, namely, that the bond is without consideration. The bill also charges that he was induced to execute the bond by fraud, but as this charge is wholly unproved, it may be dismissed without further remark.

At the time the bond and mortgage were executed, the complainant and Halliard were both officers of the bank—Halliard was its president, and had been for several years, and the complainant was a member of the board of directors, and had also been a member of the executive committee of the board since November, 1875. Halliard had been allowed to manage the affairs of the bank in his own way, and without being required to report his transactions to the board. At a meeting of the executive committee, held on the 15th of February, 1877, it was found that Halliard had abstracted a number of securities belonging to the bank, representing in value a large sum of money. He promised to secure the bank as soon as possible. The complainant was at this time chairman of the executive committee; he professed to have full confidence in Halliard's honesty, and advised the committee " to act very quietly," and not press Halliard, as a contrary course would be productive of no good, and might result in injury to the bank. His advice was adopted. No action was taken against Halliard, and no time was fixed

within which he should secure the bank; nor was he required to disclose the character or nature of the security he intended to offer. His powers were neither suspended nor curtailed, nor was any time appointed for a subsequent meeting of the committee, when his misconduct should be further considered, and more definite action taken. The advice that the committee should act very quietly seems to have been understood that they were to take no action whatever, but dismiss the matter entirely, and let Halliard take such course, in furnishing security, as his sense of duty might dictate.

The bond and mortgage were actually executed on the 17th of April, 1877, though dated November 1st, 1876. The circumstances attending their execution are thus described by the complainant: He says Halliard told him that he had a paper at the office of the counsel of the bank, which he wanted him to sign; that he inquired what the paper was, and that Halliard replied he wanted to put his Morristown farm in complainant's name, but he must not ask too many questions; that what he wanted complainant to do was only a matter of favor, it was all right and he would take care of it. The complainant says, without further inquiry or investigation, he executed the bond and mortgage. Shortly afterwards, Halliard conveyed the farm covered by the mortgage to the complainant, for a consideration, as the deed states, of $30,000. The mortgage states that it was given to secure a part of the purchase-money of the mortgaged premises. These papers are false. No sale of the farm was made to the complainant, nor was the deed for it ever formally delivered to him. The complainant says he never saw the bond and mortgage after he executed them, and that the first knowledge that he received that the bank held them, came in the form of a notice from the bank that six months' interest was due and must be paid. On receiving this notice, the complainant went to Halliard and asked him what it meant; Halliard replied it was all right, he would take care of it, and then gave the complainant sufficient money to pay the interest, which the complainant immediately paid to the bank. This payment was made October 31st, 1877.

A subsequent payment of interest was made on the 9th of May, 1878, by the complainant, with money furnished by Halliard. Halliard delivered the bond and mortgage to the bank some time prior to the 31st of October, 1877 ; they were laid before the finance committee, accepted and credited to Halliard as a payment of $10,000 on that part of his indebtedness which he incurred by the abstraction of $20,000 in United States bonds. From the time the bond and mortgage were accepted, they were treated, with the knowledge of the complainant, as an asset of the bank. Two divisions of profits were subsequently made— the first in November, 1877, and the last in May, 1878—and in each instance, in ascertaining the surplus which remained for distribution among the depositors, the bond and mortgage were treated not only as an asset, but as worth their full face. The complainant was present at the first of these meetings, and participated in deciding what dividend should be declared. He admits that he never informed his fellow directors or managers, or any other officer of the bank, of any of the facts connected with the execution of the bond and mortgage, or that they were open to question, or subject to any defence whatever, until after the bank failed.

As between the complainant and Halliard, it must be admitted that these papers are without the slightest legal force, and it must also be conceded that, as a general rule, the assignee of a non-negotiable chose in action takes it subject to all the equities which could be urged against it in the hands of the person to whom it was orginally given. But there is another proposition of law pertinent to this case which needs to be stated. It is this: if the bond and mortgage were executed by the complainant for Halliard's accommodation, and Halliard was not restricted in the use he should make of them, then while it is true so long as they remained in Halliard's hands they were without legal force, yet the moment Halliard transferred them in good faith for his own accommodation, whether they were transferred for a money consideration actually paid, or in satisfaction of a pre-existing debt, or only as security for such a debt, they became, in the hands of the transferee, a living, valid and effectual security.

*Jacobsen* v. *Dodd*, 5 *Stew. Eq. 403; Lee* v. *Kirkpatrick*, 1 *Mc-Cart. 264; Westervelt* v. *Scott, 3 Stock. 80.*

The important question then is, do the facts bring this case within the last proposition? The complainant's own evidence renders it entirely clear that the bond and mortgage were made for Halliard's accommodation. They were executed to be used. This is proved conclusively by the form of the papers themselves. They were put in form to represent a sale of the farm to the complainant, for a large price, and the return of a mortgage for part of the purchase-money. Halliard was not restricted in the use he should be at liberty to make of them. He says he procured them to be made for the purpose of assigning them to the bank, and that he intended to tell the complainant what use he intended to make of them, but he will not say positively that he did tell him. The circumstances would seem to show, with reasonable certainty, that the complainant understood what use was to be made of them. He knew that Halliard was liable to the bank for a large sum of money, and that he had promised to give security for it. With a strong profession of confidence in Halliard's honesty, he had advised his fellow managers not to press Halliard. When he is notified that the bank has the bond and mortgage, he does not express surprise, nor charge Halliard with bad faith, nor claim that the use Halliard had made of them was a misappropriation. Halliard had promised to take care of them, and when he finds that Halliard had not paid the interest—that he had not taken care of them in that respect—he asks Halliard what it means, but he does not pretend that the use Halliard had made of them was contrary to his understanding or expectations. His subsequent conduct, in allowing them to be dealt with as an asset of the bank, and in concealing from his fellow managers the facts on which he now seeks to escape liability, would seem to furnish almost conclusive evidence that the use made of them was just such as he had understood and expected would be made of them.

A question ably discussed by the counsel of the complainant, namely, whether the consideration paid by the bank was sufficient to impart to it the character of a purchaser for value, so as

to raise it to a position superior in equity to that occupied by its assignor, is not, in my judgment, involved in the case. The general rule undoubtedly is, that where a non-negotiable chose in action, void between the original parties, is assigned as security for a pre-existing debt, the assignee is not a holder for value, so as to be exempt from defences which might be successfully urged against his assignor, but a different principle prevails where the thing assigned is the obligation of a third person, and the transfer is not made simply as security, but in discharge of the debt and the original debtor thereby released. Chancellor Zabriskie, in *Uhler* v. *Semple, 5 C. E. Gr. 293,* said : " The rule that a prior debt is not sufficient to make one a *bona fide* purchaser or mortgagee for value, has never been adopted in New Jersey. Our courts have uniformly held that it is a sufficient consideration to protect one holding the legal right against the prior equity of one who has no legal right, when the other has no notice of such equity." The present chancellor has, in a recent case, re-affirmed and enforced this doctrine. *Traphagen* v. *Hand, 9 Stew. Eq. 384.* But, as already remarked, the question of the sufficiency of the consideration paid by the bank to constitute it a holder for value, is not, as I think, at all material in determining the rights of the parties. It cannot be disputed, if the bond and mortgage had been made by the complainant directly to the bank, that no question could have been raised as to the sufficiency of their consideration, and it is admitted by the counsel of the complainant that if they had been made to Halliard, with the understanding that they were to be assigned to the bank, either in discharge of, or as a security for a pre-existing debt, the complainant would be bound by them. The case, in principle, on its undisputed facts, stands, I think, quite as strongly against the complainant as it would in either of the cases just mentioned. He executed the bond and mortgage for Halliard's accommodation, and gave him authority to use them for any purpose he saw fit. Under an authority so comprehensive, whether Halliard transferred them for a money consideration, or as security for, or in payment of a pre-existing debt, is wholly immaterial ; in either

case his use of them was within the purposes for which they were made, and therefore legitimate and effectual.

Where a mortgage is made by one person for the benefit of another, under an understanding that it shall be used for a specific purpose, it must be applied exclusively to that purpose, and any other disposition of it will be regarded as a fraudulent misappropriation of it, and discharge the mortgagor. *Andrews* v. *Torrey, 1 McCart. 355; Atwater* v. *Underhill, 7 C. E. Gr. 599.* But where it is given for the accommodation of the mortgagee generally, without restriction or direction as to how he shall use it, he is authorized to use it for any honest purpose, and a transfer of it to his creditor, either in payment of or as security for a pre-existing debt, will pass a title, which, in my judgment, the mortgagor cannot successfully dispute.

But I think I am also bound to say that there is nothing in the conduct of the complainant, in this transaction, which entitles him to favor, or which should induce a fair mind to be eager in trying to help him escape liability. He is chargeable with full knowledge of the contents of these papers at the time he executed them. He does not pretend that the officer before whom he executed them did not faithfully perform his duty.

A person who executes instruments of the nature of those under consideration, is bound to look and see what they are before he signs them, and if he willfully shuts his eyes, or rashly closes his ears when he has a full opportunity to see everything, or to know everything, he must submit to the consequences of his folly. The complainant allowed the papers to represent a condition of affairs which he knew to be false, and which he also knew would give them a currency and credit they were not in fact entitled to. He allowed them to be clothed in that sort of false garb which was best calculated to render them successful as instruments of deception. The law justly declares that he who enables another to commit a fraud, shall himself be answerable for the consequences of the fraud. If the complainant, by first furnishing Halliard with these papers, and afterwards, after they were assigned to the bank, by his acts and by his silence, designedly produced a false impression as to their real character,

to the injury of the bank, it is clear he is not entitled to the aid of a court of equity against the bank. This would be so, even if, when he did the acts and was guilty of the concealment, he had been under no duty to guard and protect the interests of the bank, but he was then under such duty. He was one of the managers of the bank, and as such was charged with the duty of seeing that no invalid or worthless security was put off on the bank. If, while thus in a position where his duty required him to be vigilant and faithful, he stood silently by and allowed his own obligations, which he knew to be invalid, to be passed to the bank as valid, and after the bank received them, by repeated acts affirmed their validity, neither honesty nor justice will now allow him to dispute their validity. He cannot play fast and loose; he cannot treat the papers as valid so long as he thinks there is no danger in doing so, and then, when danger appears, turn upon himself and say all that he had previously said by his acts and by his silence was false, and that the papers never possessed the slightest validity. In such a case he must be held to be concluded by his conduct.

This is a case in which, I think, this court might very properly decline jurisdiction, because its aid is not necessary to the protection of the complainant. An action at law had already been commenced when the complainant filed his bill, the plaintiff in that action is an officer of this court, and must, in the proper discharge of his duty, prosecute his action diligently. The ground on which the complainant asks the aid of this court, will, if established, be just as effectual as a defence to the action at law as it can possibly be as a ground of relief here. If he is successful in his defence at law, his bond will be adjudged to be without legal force, and should he desire its surrender, and the receiver refuse to give it up, this court will, in a summary way, direct its surrender; it would seem, therefore, to be entirely clear that there is nothing in the case which renders a resort to equity either necessary or expedient. While a court of equity will undoubtedly take jurisdiction in certain cases of the class to which this suit belongs, even though a complete defence at law may exist, yet it is equally certain that it will not do so simply

for the purpose of changing the forum of litigation. If an action at law has already been brought when the suit in equity is brought, the latter tribunal will not withdraw the litigation from the former, unless it satisfactorily appears that adequate relief cannot be given at law, or that the defence is of a character which cannot be made at law without embarrassment or serious hazard. *Cornish* v. *Bryan, 2 Stock. 146; Smith* v. *Smith, 3 Stew. Eq. 564.* The principle which controls courts of equity in such cases is laid down by Chancellor Kent as follows: "The resort to equity, to be sustained, must be expedient, either because the instrument is liable to abuse from its negotiable nature, or because the defence, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case, and rendering a resort to equity highly proper, and clear of all suspicion of any design to promote expense and litigation." *Hamilton* v. *Cummings, 1 Johns. Ch. 523.* It is manifest, I think, that not a single one of the conditions on which a court of equity will withdraw a litigation from another tribunal, can be found in this case, and if this court interferes, it must do so causelessly.

The complainant is not, in my judgment, entitled to the relief he asks; his bill must, therefore, be dismissed, with costs.